MISSOURI DREDGING COMPANY, a corporation, and O. R. Burden Construction Corporation, individually and as joint venturers, doing business under the joint venture name of Missouri Dredging Company and O. R. Burden Construction Corporation, a joint venture, Libelants,

v.

The TUG SOUTHERN KRAFT, NO. 5, Her Tackle, Apparel. Furniture, Engines, Boilers, and Machinery, and the International Paper Company, a corporation, Respondents.

No. 2785.

United States District Court
S. D. Alabama, S. D.

July 31, 1962.

Sam W. Pipes, III, Lyons, Pipes & Cook, Mobile, Ala., for libelants.

T. K. Jackson, Jr., Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., for respondents.

DANIEL HOLCOMBE THOMAS, District Judge.

This is a libel in rem and in personam to determine the question of liability in a collision between a tug and her tow and a work-barge anchored in Mobile River. Pursuant to the pre-trial stipulation, trial is limited to the questions of liability *vel non,* and limitation of liability, if applicable.

## OPINION

This libel was filed by the two corporations individually and as joint venturers. Respondent and claimant as owner of the Tug SK #5 is also a corporation. The collision having occurred on navigable waters, this cause is within the admiralty and maritime jurisdiction of this Court.

At a point approximately one-half mile south and downstream from where the Mobile River is formed by the conjunction of the Tombigbee and Alabama rivers, libelant was engaged in laying a submarine gas line. This was accomplished by joining sections of the pipe on the west bank and pulling the pipe by tugs and barges toward the east bank, allowing the pipe to settle into a trench previously dredged in the bottom of the river.

Although libelant had been preparing the area for several months, the actual pipe laying operation had been in process for five days prior to the accident here in issue. The above facts are not in dispute; however, as to the remainder of the facts surrounding the collision, there is much disagreement. Considering the testimony as a whole, the Court makes these additional findings of fact.

The Mobile River is approximately 1,-300 feet wide at the point where this pipe was being laid perpendicular to the banks of the river. Beginning at the west bank and progressing towards the east bank, on a line directly over the trench, the following equipment was situated:

1. A small steel work-barge, used to support the gas line by means of steel cables, was anchored about 150 feet from the west bank.

2. The work-barge Beardslee, also used to support and carry the pipe line, was anchored approximately 500 feet east of the steel work-barge. The Beardslee is about 100 feet long.

3. A pontoon, about ten feet square and used as an anchor buoy, lay approximately 125 feet east and some distance downstream from the Beardslee.

4. The dredge Mobile was tied up to the east bank, about 150 feet south of the trench.

The Beardslee was anchored at a point east of the mid-line of the river so that there was a navigable opening on the west side of her of approximately 500 feet, and a navigable opening on the east side of her, between the pontoon and the dredge Mobile, of approximately 200 feet. For reasons which will hereinafter appear, it is immaterial whether or not the Beardslee showed proper navigation lights at the time of the collision.

On the afternoon of March 24, 1959, the tug SK #5 was proceeding upstream on the Mobile River. At that time, she started to pass the Beardslee on the west side but was waived to the east by

libelant's employees standing on the Beardslee. The tug obliged and the passing was without incident. Between that time and the time of the accident, which was at dusk on the following day, the Beardslee had moved something less than 100 feet eastwardly, so that the position of the equipment at the time of the collision was as described above.

At some time between 6:15 and 6:45 p. m. on March 25, the SK #5, pulling her four barges loaded with pulp wood and displaying the proper running lights, entered the Mobile River from the Alabama River. She was moving at half speed which, with the current of the river at four knots, gave her a speed over the ground of six or seven knots. Although the SK #5 did not sound a passing signal, it was obvious to libelant's employees who were on board the dredge Mobile (the barge Beardslee being unmanned at this time) that the SK #5 was lining up to pass through the opening on the east side of the Beardslee. An employee of libelant, a laborer named Culkin, jumped from the dredge into a skiff, motored upstream to the SK #5, and told the captain of the tug he would have to go through the opening on the west side. The proctors in this cause have made much ado about what words were actually used by these two people at this time. The testimony in that regard is sufficient to convince the Court that, whatever the exact words were, they imparted to the captain of the tug the idea that he must change course immediately, which he did. He went to full ahead and steered a hard starboard in an effort to comply with the directions of libelant's employee. His maneuver was unsuccessful however, as the last two barges of his tow hung up on the Beardslee, causing it to shift downstream and damage the pipe suspended over the trench.

The Court, having now resolved the controverted factual matters, is presented with a single question, and that is whether under the circumstances the tug SK #5 and her master and crew can be charged with negligence. With regard to the specific acts of negligence charged in the libel the Court makes these findings.

The tug SK #5 was ably commanded. Captain Kepler has been her master for eighteen years and had been by this point in the Mobile River a number of times. While lining up to pass the Beardslee, both he and the mate were in the pilot house and maintaining a proper watch. The fact that two other crewmen were in their bunks asleep at this time played no part in subsequent events. There is no evidence that the speed of the flotilla was immoderate, its speed being only that necessary to maintain tension on the tow in order to control it.

The charge that the tug failed to make proper and timely evasive maneuvers to avoid collision, after danger of such collision was or should have been known, is entirely unsupported by the evidence. Until libelant's employee pulled alongside in the skiff, there was no danger apparent to those on the tug. Although the opening on the east of the Beardslee was about half that on the west, it was completely adequate to serve the SK #5 and her tow. The flotilla was some 602 feet long, with a maximum width of 32 feet. The captain has on many occasions negotiated openings of less size with similar tows. He testified, for example, that the swing bridge span at Chickasabogue is 132 feet in width and located on a curve where two streams merge. That opening requires considerable skill and timing for successful negotiation, and he has made the passage a number of times with similar size tows and has never encountered difficulty. If there was a danger of collision on the approach of the SK #5, it existed only in the mind of Culkin. While this man had had some little experience with tugs, none of it was in the Mobile area and had been obtained as a deckhand some forty years ago. I am satisfied that Captain Kepler's decision and intent to pass the Beardslee on the east were not culpable under the circumstances, particularly in view of the actions of libelant's employees at the time of the upstream passage.

It becomes necessary, therefore, to determine whether the captain reacted properly and with due caution when told to pass the Beardslee on the west. That Captain Kepler had adequate notice of the pipe laying operation and consequently approached the area with particular alertness is not to be disputed. The Corps of Engineers had twice published and circulated notice of the undertaking to operators in the Mobile area. In addition, he had passed the scene many times during preparations and, of course, passed it going upstream the previous day. At the time the instructions were given by Culkin, the SK #5 was approximately 700 or 800 feet upstream and approaching the pipe line at six or seven knots. She could not stop or reverse the engines, for to do so would have put her at the mercy of the current and to surely be overrun by her tow. It should here be noted that the tug was pulling her tow and had some fifty feet of water behind her spanned by the bridle connected to the first barge, which the Court finds to be an acceptable method of towing in this area. Captain Kepler testified that it occurred to him that there might be cables running from the pontoon or edge of the pipe to the east bank, and that this was the reason for Culkin's instructions. He made no inquiry as to why he should not use the east channel but put immediately to starboard with full ahead. This change of course put the force of the current against the starboard side of the tow, and although the tug and first two barges cleared the Beardslee, the last two barges were swept by the current into that workbarge.

Libelant suggested that the SK #5 could have dropped her bridle, heaved to, nudged up to the stern of the last barge, made up to it and reversed the engines, thereby avoiding the collision. Perhaps this could have been done if there had been more than the 800 feet available within which to make the maneuver. The unsuccessful result of such gymnastics in this situation could well have caused considerably more damage than was suffered. The other alternative would have been to continue on the planned course with disregard of Culkin's instructions. Hindsight tells us this would have been the correct thing to do, but that is not the proper criterion by which to judge the captain's actions. Once Culkin had communicated his instructions, there was no time for counsel and deliberation. The tug took the only reasonable course available to it. I cannot but conclude that Captain Kepler, in the exercise of judgment and nautical skill, did all he could do to avoid striking the Beardslee and the other equipment located nearby. Lest libelant think the Court is overlooking the fact that Captain Kepler admitted the current was faster than he first thought it was, the Court makes this additional statement. That remark was made in response to a question as to whether, after the tug started to the west side, he thought it would clear the Beardslee. That he was mistaken in this judgment does not serve to make him responsible for the collision. He had by that time committed himself to a course of action. The situation in which he found himself was not of his own making; his reactions to it were timely and proper, although not without misfortune.

Much has been said of the duties and acts of the tug and her master. What about those of the libelant? The opening on the east of the Beardslee was clear and, as far as the Court can determine, presented no hazard to an attempted passing. I recognize that libelant had a substantial investment in the equipment and labor involved in the pipe laying operation, and would have the utmost interest in trying to protect it. But at the same time I also recognize that river traffic should not be controlled by inexperienced employees. In fact, the authority under which libelant was allowed to lay the pipe across the river expressly prohibited the type of conduct which brought on this collision. Among the conditions attached to the permit for construction authorized by the De-

partment of the Army and issued to libelant's employer are:

(c) That there shall be no unreasonable interference with navigation by the work herein authorized.

(e) That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure.

Libelant not only violated the conditions of the work permit, but this connected with negligence of libelant's employee, either through inexperience or error in judgment, constituted the sole cause of the collision, and libelant cannot now be heard to complain. An appropriate order will be entered absolving the Tug SK #5 and respondent from all liability.